# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN JOSEPH GATTUS,** | : | **Civil No. 1:12-CV-1083** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Rambo)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **MICHAEL J. ASTRUE,** | : | |
| **COMMISSIONER OF** | : | |
| **SOCIAL SECURITY** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.    Statement of Facts and of the Case

#### A.    Introduction

This case comes before the court for evaluation of an Administrative Law Judge's decision denying social security disability benefits to the plaintiff, John Gattus. That ALJ decision was made against a factual backdrop marked by conflicting and inconsistent evidence relating to Gattus' medical condition, and mental health. Upon consideration, for the reasons set forth below, we conclude that the ALJ's decision is supported by substantial evidence which is adequately explained on the record and, therefore, we recommend that this decision be affirmed.

## B.    Gattus' Medical and Employment History

On April 22, 2008, John Gattus filed applications for disability benefits alleging that he could no longer work any job in the national economy since July 31, 2007 due to a knee injury and heart disease. (Tr. 221-27, 228-34, 255.) At the time of this application Gattus was 41 years old, making him a younger individual under Social Security regulations, had a high school education, and had prior work experience as a carpenter. (Tr. 20.) In October 2008, Gattus amended his application, advising Social Security that sleep apnea and chronic pulmonary obstructive disease (COPD) also contributed to his inability to work. (Tr. 57, 66.)

With respect to these presenting medical conditions, the record developed during these disability proceedings was mixed and equivocal. For example, with regard to Gattus' first medical concern, his knee injury, the evidence before the ALJ showed that Gattus suffered a displaced right knee cap fracture as a result of a motor vehicle accident. (Tr. 431.) Gattus underwent surgery for this injury, an open reduction and internal fixation, a procedure which entailed implanting two screws into his knee, in early August 2007. (Tr. 431-32, 802.)

Gattus was treated by David J. Caucci, M.D., an orthopedic surgeon, following this surgery. (Tr. 425, 428.) By October 2007, Gattus was reporting to  Dr. Caucci that he was in physical therapy and doing well. (Tr. 423.) Subsequent x-rays

continued to show the fracture, as well as a broken and a bent internal screw, but Gattus declined to undergo additional surgery proposed by Dr. Caucci. (Tr. 414, 418.) Gattus was last seen by Dr. Caucci in May 2008. (Tr. 438.) At that time Dr. Caucci's medical notes and impressions provided a profoundly mixed and contradictory picture of Gattus' condition. (Id.) Dr. Caucci's objective findings were relatively benign. Thus, Dr. Caucci noted that Gattus had a full extension range of motion of 120 degrees of flexion, and assessed his quadriceps strength at 4+ to nearly 5/5. (Id.) The doctor also noted that Gattus' ligaments were stable, and found his hamstring strength to be 5/5. (Id.) Despite these positive objective findings, however, Dr. Caucci stated without further explanation that he did not think that Gattus could work, (id.), while also concluding that Gattus needed no additional on-going treatment. (Id.)

In contrast to these inconsistent observations made by Dr. Caucci in May 2008, a contemporaneous consultative examination of Gattus undertaken in July of 2008 by Dr. Don Henderson, found that Gattus had a normal gait, walked without assistance, and had full motor power in all extremities. (Tr. 298-304.) Dr. Henderson further found that Gattus had the ability to lift 100 pounds occasionally, carry 50 pounds, occasionally, could stand or walk 4 hours during an 8 hour workday, and could occasionally bend, stoop and climb. (Id.)

The evidence relating to Gattus' coronary health was also mixed and equivocal. Thus, in March 2008, Gattus suffered a mild myocardial infarction. He was treated in a hospital emergency department for this condition before leaving the hospital against medical advice. (Tr. 377.) Gattus, a two-pack daily cigarette smoker, returned to the emergency room two days later complaining about additional chest pain and packs of cigarettes a day, was placed on aspirin and beta blockers and was counseled stop smoking, medical advice he declined to follow. (Tr. 377-78.)

Following this episode, in May 2008, Chatla VR Reddy, M.D., performed a cardiac catherization on Gattus. This procedure revealed a complete occlusion of his right coronary artery, but contained no other adverse findings and concluded that Gattus' ejection fraction, a benchmark measure of cardiac efficiency, was 65%. (Tr. 305-06). Dr. Reddy recommended that Gattus, who continued to smoke but was asymptomatic, lose weight and continue to take his medications. (Tr. 317-18.)

For his part, Gattus did not report significant cardiac symptoms for the remainder of 2008 and the majority of 2009, except when he stopped taking his medications in June 2009 and experienced fatigue. (Tr. 368.) Further, a battery of tests, including Holter monitor testing, cardiac echo imaging, and a perfusion scan performed in October 2008 and October 2009 were negative for any significant coronary abnormality. (Tr. 358-59, 362, 571-72.) In November 2009, Gattus sought

another opinion from Stafford M. Smith, M.D. (Tr. 574.) Dr. Smith, upon review of the May 2008 catheterization report, recommended elective surgical intervention, insertion of a stent to open the occluded right coronary artery. (Tr. 574.) That surgery was successfully performed in January 2010, (Tr. 587-92), and following surgery Gattus reported to both Dr. Smith and his primary care provider that he was feeling better, with improved breathing and decreased fatigue. (Tr. 482-83.) Gattus, in turn, testified that he received no further cardiac treatment and was not due to be seen by a cardiologist until 2011. (Tr. 17.)

Finally, with respect to Gattus' sleep apnea and COPD Gattus reported that he started to experience fatigue after his accident in July 2007. (Tr. 278.) In May and June 2010, he participated in two studies at the direction of Sean McVeigh M.D. (Tr. 871-75, 900-13, 918.) Those studies measured a basic medical benchmark of pulmonary efficiency, Gattus' forced expiratory volume (FEV1) and found that Gattus had a pre-drug measured FEV1 of 3.00 and post-drug measured FEV1 of 3.44. (Tr. 896.) These ratings fall well above the Social Security thresholds for disability for individuals like Gattus. Consequently, while Dr. McVeigh recommended that Gattus not drive or operate dangerous machinery when sleepy, he did not recommend any other work related restrictions. (Tr. 871.) Furthermore, by October 2009, Gattus stated that he experienced improved energy and breathing with the use of CPAP

therapy, (Tr. 68), and reported that he was able to drive between one and two hours per day. (Tr. 69.)

The wholly equivocal nature of the medical evidence amassed by Gattus in support of this disability application was aptly reflected in the medical opinion evidence provided to the ALJ. In this regard, the evidence supporting Gattus' claim consisted largely of Dr. Caucci's opinion that Gattus could not work, an opinion that was contradicted in some respects by the doctor's own objective medical findings. In contrast, three medical professionals found that Gattus' condition was not wholly disabling. This countervailing medical opinion evidence included consultative examination of Gattus undertaken in July of 2008 by Dr. Don Henderson, who found that Gattus had a normal gait, walked without assistance, and had full motor power in all extremities. (Tr. 298-304.) Dr. Henderson further found that Gattus had the ability to lift 100 pounds occasionally, carry 50 pounds, occasionally, could stand or walk 4 hours during an 8 hour workday, and could occasionally bend, stoop and climb. (Id.) In addition, Dr, Leo Potera, the state agency medical consultant, also determined from a review of Gattus' medical records that Gattus retained a residual capacity to work. (Tr. 333-339.) Finally, Dr. McVeigh, who assessed Gattus' sleep apnea and COPD, simply recommended that Gattus not drive or operate dangerous

machinery when sleepy, but did not recommend any other work related restrictions. (Tr. 871.)

## C.     The ALJ Hearing and Decision

It was against the backdrop of this equivocal record regarding Gattus' physical condition that the ALJ conducted hearings on December 22, 2009, April 23, 2010 and November 23, 2010. (Tr. 25-75.) At these hearings, Gattus testified, and a vocational expert (VE) presented evidence that a hypothetical individual, with a work history as carpenter, who had those limitations set forth by the ALJ, could perform jobs that existed in significant numbers in the national economy. (Tr. 71-74).

On November 23, 2010, the ALJ issued his decision denying Gattus' application for benefits. (Tr. 9-22). After carefully reviewing the conflicting and contradictory medical evidence, the ALJ found that Gattus's orthopedic, coronary and pulmonary ailments, while severe, did not meet any of the listing criteria which would qualify Gattus for benefits at step 3 of the five step Social Security disability assessment process. The ALJ further concluded that Gattus retained the ability to perform:

> sedentary work with the following non-exertional limitations: limited to routine, repetitive tasks, defined as no detailed or complex or complex tasks as required by skilled or semi-skilled labor; no exposure to hazards, unprotected heights, or dangerous equipment; no concentrated exposure to dust, fumes, odors, gases, poor ventilation, or extremes of

temperature or humidity; no climbing ladders or scaffolding; no crawling; infrequent kneeling; and occasional balancing, crouching, and climbing ramps or stairs.

Based on this determination, the ALJ found that, while Gattus could not perform his past relevant work as a carpenter, he could perform other sedentary jobs that existed in significant numbers in the national economy, and thus was not disabled (Tr. 20-21.)

## D.    Post-Decision Claims and Evidence

This appeal followed. (Doc. 1.) In connection with this appeal, Gattus offered for the first time evidence that he also suffered from a depressive disorder. (Doc. 8, Ex. A.) There were several problems with this belated submission. First, this claim of depression was never presented to the ALJ. Second, this depression claim was based upon a May 2012 assessment of Gattus and thus involved matters arising some 18 months after the ALJ decision. Third, the mental health assessment of Gattus conducted in May of 2012 concluded that he had a Global Assessment of Functioning (GAF) score of 55, a score which was consistent with only a moderate level of impairment.[1] Finally, a review of this report reflects internal inconsistencies in the

---

[1]GAF score, or a Global Assessment Functioning scale, takes into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness and is not supposed to include the consideration of impairment in functioning due to physical (or environmental) limitations. *Diagnostic and Statistical Manual of Mental Disorders, Fourth*

mental health evaluation, inconsistencies which cast doubt upon the weight which can be afforded to this report. For example, in the evaluation Gattus reported an unremarkable psycho-sexual history and orientation, and denied any need to discuss any psycho-sexual matters. (Id.) However, the report also revealed a significant psycho-sexual component to Gattus' criminal history, a prosecution of Gattus in 2004 for possession of child pornography, which resulted in 6 months' imprisonment. (Id.)

Having tendered this belated submission, the parties have now fully briefed this matter, and this case is now ripe for resolution. For the reasons set forth below, we find that substantial evidence supports the ALJ findings in this case; that those findings are adequately explained on the record; and that the findings reflect an

---

*Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, it should be noted that GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc.2000). GAF scores in the 51–60 range indicate [only] moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 F. App'x 898, 900 (3d Cir.2002). DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012).A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809 (E.D. Pa. 2006).

appropriate assessment of all of the medical evidence. Therefore, it is recommended that this appeal be denied.

## II. Discussion

### A. Standards of Review–The Roles of the Administrative Law Judge and This Court

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the administrative law judge (ALJ) and this court. At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits. To receive disability benefits, a claimant must present evidence which demonstrates that the claimant has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work. For purposes of the preceding sentence

10

(with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In making this determination the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520. See also Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). If the ALJ finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. § 404.1520. As part of this analysis the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. § 404.1520.

This disability determination also involves shifting burdens of proof. The initial burden rests with the claimant in steps 1 through 4 to demonstrate that he is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with

the claimant's abilities, age, education, and work experience can perform.  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).

Moreover, where a disability determination turns on an assessment of the level of a claimant's pain, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529.  Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." <u>Hartranft v. Apfel</u>, 181 F.3d 358, 362 (3d Cir. 1999).  Cases involving an assessment of subjective reports of pain "obviously require[ ]" the ALJ "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." <u>Id</u>.

In making this assessment, the ALJ is guided both by statute and by regulations. This guidance eschews wholly subjective assessments of a claimant's disability. Instead. at the outset, by statute the ALJ is admonished that an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain

or other symptoms alleged and which, when considered with all the evidence. . . , would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

Applying this statutory guidance, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. Under these regulations, first, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. § 404.1529(b). In so doing, the medical evidence of record is considered along with the claimant's statements. 20 C.F.R. § 404.1529(b). Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the claimant's statements regarding his symptoms: "In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or

other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. SSR 96-4p provides that "Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s)." SSR 96-4p.

The ALJ's disability determination must also meet certain basic procedural and substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons

for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

Once the ALJ has made a disability determination, it is then the responsibility of this court to independently review that finding. In undertaking this task, this court applies a specific, well-settled and carefully articulated standard of review. In an action under 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security denying Plaintiff's claim for disability benefits, Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). When reviewing the denial of disability benefits, we must simply determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); see also Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)." Johnson, 529 F.3d at 200. See also Pierce v. Underwood, 487 U.S. 552

(1988). It is less than a preponderance of the evidence but more than a mere scintilla of proof. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)(quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966). Moreover, in conducting this review we are cautioned that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715,

2000 WL 288246, *9 (E.D. Pa. March 7, 2000). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981).

### B. The ALJ's Decision Was Supported By Substantial Evidence

Judged against this deferential standard of review we find that the ALJ's disability decision in this case was supported by "substantial evidence" and therefore may not now be disturbed. Indeed, given the many conflicting and contradictory threads in the evidence presented to the ALJ, this ruling reflects a thorough, careful, balanced analysis of the proof. It is, therefore, the paradigm of a decision which draws carefully upon substantial evidence.

### 1. The ALJ Did Not Err in His Step-Three Analysis of Gattus' Claims

At the outset, in this appeal Gattus contends that the ALJ erred at step three of this five-step sequential analysis when he failed to find that Gattus' orthopedic, coronary and pulmonary conditions were *per se* disabling in that they met or equaled a listed impairment set forth in 20 C.F.R. pt. 404, subpt. P, app. 1. This argument, which forms Gattus' principal claim on appeal, merits only brief consideration. It is well-settled that the purpose of the Listing of Impairments is to describe impairments

"severe enough to prevent a person from doing any gainful activity," regardless of age, education or work experience. 20 C.F.R. § 416.925(a); see also, Sullivan v. Zebley, 493 U.S. 521, 532 (1990). The claimant bears the burden of proving that his impairment meets or equals a listing. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). Ortega v. Comm'r of Soc. Sec., 232 F. App'x 194, 196 (3d Cir. 2007). However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, Plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. §416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id. Where a disability claimant does not show that he has met all of the listed criteria, an ALJ should rule in favor of the Commissioner at step three of this analytical process. See Ortega v. Comm'r of Soc. Sec., 232 F. App'x 194, 196 (3d Cir. 2007)(denying disability finding at step 3 based upon diabetes); Small v. Comm'r of Soc. Sec. Admin., 60 F. App'x 919, 922 (3d Cir. 2003).

Here, as the ALJ cogently noted, Gattus' proof did not establish that he met all of the medical criteria for a finding of disability at step 3 of this analytical process based upon Gattus' orthopedic, coronary and pulmonary conditions. For example, Listing 1.02, Major Dysfunction of a Joint, provides that an individual meets this

listing only when he has major dysfunction of a joint characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints, accompanied by findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02.

In this case, however, the ALJ noted that Gattus did not meet the Listing of 1.02(A) because his knee injury did not result in the inability to ambulate effectively, which requires a showing of an extreme limitation of the ability to walk. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00B2. Indeed, the evidence showed that Gattus did not require any assistive device to ambulate and that he was able to walk distances at a reasonable pace. Rather, Gattus was observed to have a normal gait and could walk unassisted. Further, Gattus reported that he could walk two-to-three city blocks without needing to stop and that he was able to go grocery shopping on his own twice a week. (Tr. 44, 55, 273, 275-76.) This self-reported activity refuted a claim of compete orthopedic disability. Accordingly, the ALJ properly found that Gattus did not meet Listing 1.02.

Likewise, Gattus has not shown that he met the medical criteria for a disability finding under Listing 3.02 which relates to pulmonary ailments. That listing relies, in

part, upon objective metrics to assess lung function and explains that an individual's impairment is of listing-level severity if the individual has "[c]hronic obstructive pulmonary disease due to any cause, with the FEV1 [Forced Expiratory Volume] equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02. Here, the ALJ found that the required FEV1 level corresponding to Gattus' height of 73 inches (Tr. 254) was 1.65. (Tr. 14.) The only FEV1 readings in the record indicate that Gattus had a pre-drug measured FEV1 of 3.00 and post-drug measured FEV1 of 3.44 (Tr. 896), ratings well in excess of the 1.65 (or below) necessary for Gattus to meet Listing 3.02.

Finally, Gattus did not meet the listing criteria for coronary disease, set forth in Listing 4.04C, which require proof of coronary artery disease with angiographic evidence showing: 50 percent or more narrowing of a non-bypassed left main coronary artery; or 70 percent or more narrowing of another non-bypassed coronary artery; or 50 percent or more narrowing involving a long (greater than 1 em) segment of a non-bypassed coronary artery; or 50 percent or more narrowing of at least two non-bypassed coronary arteries; or 70 percent or more narrowing of a bypass graft vessel; *and* very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing

4.04C. (Emphasis added.) In fact, Gattus' reports of his own physical activity level thoroughly rebut any claim that his heart condition imposed very serious limitations on his ability to independently initiate, sustain, or complete activities of daily living. In the course of these ALJ proceedings, Gattus reported that he able to walk two city blocks without stopping, stand for thirty minutes, lift and carry about ten pounds, attend to his personal care without significant difficulty, cook complete meals on a daily basis, do laundry, drive a car on a daily basis, and go grocery shopping twice a week. (Tr. 56, 272-76.) All of these self-reported activities are inconsistent with a step 3 finding of complete coronary disability. Therefore, in order to reject Gattus' claims in this regard, the ALJ need only have credited Gattus' own statements.

2. **There Is Substantial Evidence Supporting the ALJ's Conclusion That Gattus' Physical Limitations Were Not Disabling**

As to Gattus' overall claims of physical disability, and his assertion that the ALJ erred in his step 5 analysis of his residual functional capacity, as we have noted this decision involved an assessment of conflicting and equivocal medical evidence. This evidence showed that the plaintiff's subjective complaints were not supported by independent diagnostic evidence and testing. Since "there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from

anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged," 42 U.S.C. § 423(d)(5)(A), the results of these diagnostic tests, which did not confirm the type of abnormalities which would sustain the plaintiff's reports of pain, constituted "substantial evidence" supporting the ALJ's finding.

Similarly, the ALJ's assessment of the competing medical evidence rested upon sufficient "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Johnson, 529 F.3d at 200, and therefore was supported by "substantial evidence." In this case, the ALJ correctly noted that the plaintiff's complaints were not consistently supported by medical treatment records. The ALJ then determined that the various consulting medical opinions which found that Gattus retained some residual capacity to work drew greater and more persuasive support from the evidence, than the isolated opinion of Dr. Caucci, an opinion which was at odds with the doctor's clinical findings. Given these conflicts in the evidence, the ALJ as fact-finder was entitled to give greater weight in this regard to this objective medical evidence, objective evidence which did not support Gattus' claims of total disability. Recognizing that the "substantial evidence" standard of review prescribed by statute is a deferential standard of review, Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), which is met by less than a preponderance of the evidence but more than a mere

scintilla of proof, <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), we find that the ALJ's decisions assessing this competing proof regarding the plaintiff's's ability to function despite his various claimed physical impairments was supported by substantial evidence and may not now be disturbed on appeal.

Beyond being adequately supported by the evidence, the ALJ's decision must must also be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707. Thus, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Com. of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999). In this case we find that the ALJ's decision provided a full statement of the critical evidence, individually assessed that evidence, and adequately explained which proof was found persuasive, and which evidence was discounted. Since the ALJ's decision adequately addressed this conflicting and equivocal medical evidence, the medical evidence cited in this appeal did not suggest that the ALJ's ultimate conclusion was unsupported by substantial evidence, and there is no legal requirement that the ALJ discuss "every tidbit of evidence included in the record." <u>Hur v. Barnhart</u>, 94 F. App'x 130, 133 (3d Cir. 2004), Gattus' complaints

about the manner in which the ALJ assessed the evidence do not provide grounds for setting aside the ALJ's judgment when we scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981).

C.    **Gattus is Not Entitled to a Remand Based Upon Matters That Were Not Presented to the ALJ**

Finally, we conclude that Gattus is not entitled to a remand of this case based upon matters which were never presented to the ALJ; namely, the mental health concerns first identified in May 2012. As we have noted, there were several problems with this tardy submission. First, this claim of depression was never presented to the ALJ. Second, this depression claim was based upon a May 2012 assessment of Gattus and thus involved matters arising some 18 months after the ALJ decision. Third, the mental health assessment of Gattus conducted in May of 2012 concluded that he had a Global Assessment of Functioning (GAF) score of 55, a score which is consistent with only a moderate level of impairment. Finally, a review of this report reflects internal inconsistencies in the mental health evaluation, inconsistencies which cast doubt upon the weight which can be afforded to this report.

While 42 U.S.C. § 405(g) provides that: "The court may, . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good

cause for the failure to incorporate such evidence into the record in a prior proceeding." In making this determination "the materiality standard of § 405(g) requires 'that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination.' Id. See also Booz v. Secretary of Health and Human Services, 734 F.2d 1378, 1381 (9th Cir.1984); Dorsey v. Heckler, 702 F.2d 597, 604–05 (5th Cir.1983); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir.1981). Thus, to secure remand, a claimant must show that new evidence raises a 'reasonable possibility' of reversal sufficient to undermine confidence in the prior decision." Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985). In practice, "[f]our factors must be considered pursuant to this requirement. See, e.g., Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir.1985). First, the evidence must be new and not merely cumulative of what is already in the record. Id. at 287. Second, the evidence must be material, relevant and probative. Id. Third, there must exist a reasonable probability that the new evidence would have caused the Commissioner to reach a different conclusion. Id. Fourth, the claimant must show good cause as to why the evidence was not incorporated into the earlier administrative record. Id." Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 472 (3d Cir. 2005).

Here, we find that Gattus' belated submission does not justify a remand of this case for several reasons. First, that submission relates to conditions that are identified

some 18 months after the ALJ's decision. Under §405(g), "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition. See Ward v. Schweiker, 686 F.2d 762, 765 (9th Cir.1982)." Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Since this evidence does not relate to the period for which benefits were denied, it does not meet this basic materiality requirement, and does not warrant a remand of this case.

Moreover, "to secure remand, a claimant must show that new evidence raises a 'reasonable possibility' of reversal sufficient to undermine confidence in the prior decision." Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985). Here we find that Gattus' belated submission does not meet this standard justifying remand since it does not raise a reasonable possibility that the outcome of this case would be different if this evidence was considered. We reach this conclusion for two reasons.

First, the mental health assessment does not disclose a disabling impairment. Rather, the mental health assessment of Gattus merely concluded that he had a Global Assessment of Functioning (GAF) score of 55, a score which is not disabling and is consistent with only a moderate level of impairment. In fact, courts have frequently rejected disability claims on factual records which were more compelling, and have

affirmed the denial of benefits in cases in which claimants presented similar, and lower, GAF scores. See, e.g., Rios v. Comm'r of Soc. Sec., 444 F. Appx. 532 (3d Cir.2011)(affirming Commissioner where, the record indicated that the plaintiff was assessed three GAF scores at different times of 50, 50, and 50–55 respectively); Gilroy v. Astrue, 351 F.App'x 714 (3d Cir. 2009)(affirming ALJ decision denying disability benefits despite GAF of 45); Glover v. Astrue, CIV.A. 10-901, 2011 WL 1562267 (E.D. Pa. Mar. 31, 2011) report and recommendation adopted, CIV.A. 10-901, 2011 WL 1597692 (E.D. Pa. Apr. 26, 2011(lowest identified GAF rating was 48).

Moreover, whatever probative value this GAF score may have possessed is substantially undermined by the internal inconsistencies disclosed in this evaluation. For example, in the evaluation Gattus reported an unremarkable psycho-sexual history, and denied any need to discuss psycho-sexual matters, but the report presents plainly contradictory evidence in that also states that Gattus was prosecuted in 2004 for possession of child pornography, a glaring inconsistency which undermines the reliability of the report in ways which cast further doubt upon its probative value.

Finally, to the extent that Gattus may be trying to assert that this condition existed at the time of his original disability application in 2008, this claim encounters yet another obstacle since Gattus provides no explanation for the failure to develop this evidence at an earlier stage of these proceedings. Therefore, Gattus does not

satisfy his responsibility under §405(g) to "show good cause as to why the evidence was not incorporated into the earlier administrative record. Id." Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 472 (3d Cir. 2005).

In short, the record in this matter shows that the claimant's complete medical history was adequately developed, but that medical history fully justified the ALJ's finding that Gattus was not disabled. Recognizing that substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)," Johnson, 529 F.3d at 200; and consists of less than a preponderance of the evidence but more than a mere scintilla of proof, Richardson v. Perales, 402 U.S. 389, 401 (1971); we conclude that there was substantial evidence which supported the ALJ findings in this case. Therefore, those findings should not be disturbed on appeal.

## III.  **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the Commissioner's decision be upheld.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition

of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 17th day of January, 2014.


*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge